9

DOWNEY BRAND LLP
JAMIE P. DREHER (Bar No. 209380)
GREGG D. JOSEPHSON (Bar No. 230996)
KELLY POPE (Bar No. 235284)
621 Capitol Mall, 18th Floor
Sacramento, CA 95814-4731
Telephone: (916) 444-1000
Facsimile: (916) 444-2100
jdreher@downeybrand.com
gjosephson@downeybrand.com
kpope@downeybrand.com

Attorneys for Debtors
SHASTA LAKE RESORTS, LP

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| SHASTA LAKE RESORTS, LP, | Case No. 11-37221 |
|---|---|
| Debtor. | Chapter Number: 11 |
| | Docket Control No. DB-008 |
| | **MOTION TO APPROVE HOUSEBOAT SALE AND HOUSEBOAT SALES PROGRAM (11 U.S.C. § 363(b))** |
| | Date: September 7, 2011<br>Time: 10:00 a.m.<br>Dept: C, Ctrm. 35<br>Judge: Hon. Christopher M. Klein |

FILED
August 17, 2011
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003709001

Shasta Lake Resorts, LP ("Debtor"), a debtor and debtor in possession in this chapter 11 case, moves this Court for an order authorizing Debtor to continue its program of selling used houseboats from its fleet, and transmitting the sales proceeds to Bank of America to pay down principal on the secured debt (the "houseboat sales program"). Additionally, the Debtor moves this Court for an order approving a pending sale of one of its surplus houseboats pursuant to the houseboat sales program to the Twin Lakes Management Company, Inc. ("TLMC"). This motion is supported by the concurrently filed Exhibit List, and all pleadings and papers on file in this case. In addition, Debtor respectfully represents the following:

## JURISDICTION AND VENUE

1. Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 13, 2011 ("Petition Date"). Debtor continues to operate its business and possess property as debtor in possession in accordance with Bankruptcy Code §§ 1107 and 1108. Debtor's primary place of business is in the Eastern District of California.

2. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §157(b). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested is contained in section 363 of Title 11 of the United States Code ("Bankruptcy Code").

## BACKGROUND AND FACTS

### History of the Debtor

3. Debtor is a leading supplier of luxury houseboat rentals in Northern California, operating a fleet of approximately 65 houseboats primarily out of its Jones Valley Resort on Shasta Lake and its New Melones Lake Marina. Debtor offers a full service dock at both Jones Valley Resort and New Melones Lake Marina, with overnight and year round moorage and small boat and accessory rentals. Debtor also operates floating stores which sell everything its customers may want to complete their houseboating experience, including grocery items, bait and tackle, water sports and marine items, unique gifts and apparel. Debtor offers slip rentals at Sugarloaf Resort on Shasta Lake. Collectively, Jones Valley Resort, New Melones Lake Marina

and Sugarloaf Resort are hereinafter referred to as the "Resorts."

4. Debtor is headquartered in Lodi, California, and operates under the tradename "Houseboats.com." Debtor currently has 42 full-time employees and 34 seasonal/part-time employees.

5. As discussed in more detail below, various factors have combined to cause the Debtor to seek relief under chapter 11 of the Bankruptcy Code, with the ultimate goal of preserving the value of the estate's assets and successfully reorganizing. Among other things, recent challenges in the vacation industry, due in large part to the current financial and economic crisis have reduced the Debtor's revenues and cash flow from operations. These pressures have been exacerbated by the Debtor's current secured lender, Bank of America ("BofA"), who has refused to extend or otherwise modify the terms of its approximate $4.1 million term loan in a manner that allows the Debtor to continue to drastically reduce its debt (which it has done successfully for the last two years) by selling excess houseboat inventory, stabilizing operations and surviving through this recession.

**Current Financial Challenges**

6. As of the Petition Date, the Debtor was a borrower under that certain Loan and Consolidation Agreement dated as of September 30, 2009 between it and BofA (the "Loan Agreement"). The Loan Agreement consolidated a prior loan agreement with BofA for term and revolving debt. The Debtor's obligations under the Loan Agreement are secured by substantially all of its assets, with the Debtor's general partner, Water Resorts, Inc., guarantying the Debtor's obligations thereunder.

7. Pursuant to the terms of the Loan Agreement, the loan was originally scheduled to mature on December 31, 2010 (which in itself was a consolidation of previous financing arrangements, and which also required a $500,000 principal payment reduction). Debtor was unable to pay or refinance the loan by that date, and instead negotiated to extend the term of the loan until June 30, 2011.

8. One of the terms of the extension through June 30, 2011 was that BofA would impose a $50,000 fee in the event that the loan was not repaid in full by the new date.

9. The Debtor was unable to repay or refinance the BofA loan on or before the June 30, 2011 maturity date. This constituted an event of default under the terms of the Loan Agreement, and BofA imposed the $50,000 penalty on Debtor. On July 1, 2011, BofA, without permission from Debtor, unilaterally debited the Debtor's bank account at BofA in the approximate amount of $24,900, in partial satisfaction of the penalty. BofA also indicated that it would be imposing a default rate of interest.

10. BofA has collateral valued at more than twice the outstanding indebtedness, and it has enjoyed an aggressive amount of principal repayment over the last 2 years. Nonetheless, it has been unwilling to further extend the loan's maturity date, reduce the interest rate charged on the loan (currently at 5% over the Prime Rate, or 8.25% and an even higher default rate of 14.25%) or otherwise relax these covenants for any meaningful period of time.

## RELIEF REQUESTED

11. In the last two years, the Debtor has reduced the amount of the original indebtedness to BofA from approximately $6 million to its present balance of approximately $4.1 million. The principal reduction was accomplished, in part, through selling surplus houseboats from the Debtor's fleet (the "houseboat sales program"). Pursuant to its houseboat sales program, as houseboats in the Debtor's fleet become outdated or for other reasons no longer meet with the standards that the Debtor provides to its customers, the Debtor lists the boats for sale on its website. This is a common practice in the industry, and consumers in the market to buy houseboats know that rental fleets like the Debtor are a good resource to purchase quality, luxury used houseboats.

12. The Debtor currently has three surplus houseboats listed for sale on its website. Additionally, the Debtor has a proposed agreement (contingent upon Bankruptcy Court approval) for the sale of a fourth surplus boat. A copy of the proposed agreement is attached as Exhibit A to the concurrently filed Exhibit List. The proposed agreement is for the sale of an Eclipse model houseboat with permit to TLMC for a purchase price of $91,518, which includes taxes and fees. The proposed sale was reached through arm's length negotiations between the Debtor and TLMC. Pursuant to the houseboat sales program, the Debtor will remit the net proceeds from the sale of

1 | $71,000 to BofA as payment on the principal balance of the indebtedness.

2 |     13.    By this motion, the Debtor seeks entry of an order, pursuant to sections 105(a) and 363 of the Bankruptcy Code, approving the proposed sale to TLMC, and authorizing the Debtor to continue its houseboat sales program during this case, in order to reduce its surplus fleet and at the same time, lower the principal balance on the BofA loan.

**BASIS FOR RELIEF**

**The Proposed Sale And Houseboat Sales Program Are In The Ordinary Course Of Business**

    14.    Pursuant to section 363(c)(1), a debtor in possession is entitled to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." In considering whether a transaction is in the ordinary course of a debtor's business, courts apply two tests: the horizontal dimension test and the vertical dimension test. See *In re Dant & Russell, Inc.*, 853 F.2d 700, 704 (9th Cir. 1988).

    15.    The horizontal dimension test involves determining "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." *Id.* at 704. This test is met when the transaction is of the sort "occurring in the day-to-day operations of debtor's business." *Id.* "The transaction need not have been common; it need only be ordinary." *Id.* Thus, "[a] transaction can be ordinary and still occur only occasionally." *Id.*

    16.    Under the vertical dimension test, the Court looks at the transaction from the view of a hypothetical creditor and "inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *Id.* at 705 (citations omitted). The Court also looks at the debtor's prepetition business activities as compared to its postpetition business activities to determine whether the transaction is in the ordinary course of the debtor's business. *Id.* It has been noted, under this test, that the "touchstone of 'ordinariness' is…the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice

and hearing, because their objections to such transactions are likely to relate to the bankrupt's Chapter 11 status, not the particular transactions them-selves." *Id.* (citations omitted).

17. The houseboat sales program is within the ordinary course of the Debtor's business and satisfies both the horizontal and vertical dimensions tests. Selling surplus inventory is an ordinary and regular practice in the rental fleet industry in general (e.g., rental car agencies) and in the houseboat rental business in particular. It is an economical way for companies like the Debtor to dispose of surplus houseboats. Actual sales of surplus houseboats may only happen occasionally, given the limited demand for large luxury items like houseboats. However, the practice of listing and selling surplus houseboats is the type of practice that other businesses like the Debtor engage in as an ordinary part of the business.

18. Additionally, BofA is well aware of the houseboat sales program, and has benefitted from it for at least the last two years. Pursuant to this program, the Debtor has sold surplus houseboats over the past several years and remitted the sales proceeds to BofA in order to reduce the principal balance of the indebtedness. Thus, the houseboat sales program is consistent with BofA's reasonable expectations of what transactions the Debtor is likely to enter in the course of its business. Accordingly, the houseboat sales program and the proposed sale to TLMC are conducted in the ordinary course of the Debtor's business.

**The Proposed Sale And Houseboat Sales Program Are In The Sound Business Judgment Of The Debtor**

19. Should this Court determine that the houseboat sales program is not within the Debtor's ordinary course of business, the program in general, and the proposed sale to TLMC in particular, may still be approved by this Court pursuant to section 363(b)(1) of the Bankruptcy Code.

20. Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "A bankruptcy court has discretion with ruling on a § 363(b) motion." *In re 240 North Brand Partners, Ltd.*, 200 B.R. 653, 656 (9th Cir. BAP 1996).

21. In interpreting Bankruptcy Code § 363(b)(1), courts have held that a transaction involving property of the estate generally should be approved so long as the debtor can demonstrate "some articulated business justification for using, selling, or leasing property outside the ordinary course of business." *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *accord In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Walter*, 83 B.R. at 19-20 (9th Cir. B.A.P. 1988). Some of the factors courts consider include, inter alia, the consideration to be paid, the financial condition and needs of the debtor, the qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would decline in value if left in the debtor's possession. *See e.g., In re Work Recovery, Inc.*, 202 B.R. 301, 304 (Bankr. D. Ariz. 1996) (approving sale of a surplus property which was not essential to the reorganization effort and would reduce the secured debt).

22. The houseboat sales program and the proposed sale to TLMC meet each of the relevant factors. The Debtor has articulated numerous reasonable business justifications in support of the houseboat sales program.

23. The Debtor has a long-standing practice of selling surplus houseboats. Selling the boats saves the Debtor expenses associated with storing and maintaining houseboats that are no longer useful to the business. Further, selling the surplus houseboats enables the Debtor to pay down the principal balance of its debt to BofA. It is a win win situation for the Debtor, BofA and the unsecured creditors. Additionally, the surplus houseboats are not essential to the reorganization effort, and the sales program therefore will not interfere with the reorganization. In the Debtor's sound business judgment, the houseboat sale program is the best way to dispose of surplus houseboats while simultaneously paying down its secured debt.

24. The terms of the proposed houseboat sale are fair and reasonable. The purchase price of $91,518 is a fair price for the houseboat and permit. The Debtor does not seek approval of the pending sale, or any other sale in the course of the houseboat sales program free and clear of liens, but rather, a condition to close any sale is that BofA release its liens in the affected houseboats. Neither owners nor insiders of the Debtor will receive any consideration or sales proceeds as a result of the houseboat sales program. Rather, all of the sales proceeds will go

directly to BofA.

**The Proposed Sale Is in Good Faith Under § 363(m)**

25. The Debtor requests that this Court find that the proposed houseboat sale is in good faith and that TLMC is entitled to the benefits and protections provided by Bankruptcy Code § 363(m). Specifically, Section 363(m) provides in pertinent part:

> "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending the appeal."

11 U.S.C. § 363(m).

26. In construing Section 363(m), the Ninth Circuit has stated a good faith purchaser is one who buys in good faith and for value. *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 281 (9th Cir. 1992) (citing *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3rd Cir. 1986); *In re Filtercorp, Inc.*, 163 F.3d 570, 577 (9th Cir. 1998) (citing *In re Ewell*). To constitute a finding of lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id.*

27. The proposed houseboat sale is in good faith. There is no evidence of fraud or collusion in the proposed sale. Quite the contrary – the Purchase Agreement & Contract of Sale is the result of arm's length negotiations between the Debtor and TLMC. Further, BofA is fully aware the Debtor has been active in marketing its surplus houseboats. The Debtor expects that none of its creditors will oppose the transaction and some may, in fact, encourage it. The Purchase Agreement & Contract of Sale is the result of good faith negotiations between the Debtor and TLMC and not the result of fraud or collusion between the parties.

**NOTICE**

28. All creditors and parties in interest will receive notice of the hearing on this motion and will be provided with an opportunity to be heard. The Debtor submits that such notice is adequate for entry of the order approving the houseboat sales program and the terms of

1173904.2

8

the proposed sale, and satisfies the requisite notice provisions required under Section 363(b) of the Bankruptcy Code and Bankruptcy Rule 2002.

WHEREFORE, the Debtor respectfully requests that this Court enter an order granting the relief requested herein and such other and further relief as this Court deems appropriate.

DATED: August 17, 2011  DOWNEY BRAND LLP

By: _____
JAMIE P. DREHER
Attorney for Debtor
SHASTA LAKE RESORTS, LP